PRESENT: All the Justices

LANSDOWNE CONSERVANCY

v. Record No. 250492

STATE CORPORATION COMMISSION, ET AL.

LOUDOUN COUNTY, VIRGINIA

v. Record No. 250493

STATE CORPORATION COMMISSION, ET AL.

LOUDOUN COUNTY, VIRGINIA

v. Record No. 250494

STATE CORPORATION COMMISSION, ET AL.

LANSDOWNE CONSERVANCY

v. Record No. 250495

STATE CORPORATION COMMISSION, ET AL.

OPINION BY
JUSTICE TERESA M. CHAFIN
FEBRUARY 19, 2026

FROM THE STATE CORPORATION COMMISSION

The State Corporation Commission (the "Commission") approved two applications filed

by Virginia Electric and Power Company ("VEPCO") for certificates of public convenience and

necessity ("CPCNs") for projects proposing the construction of high-voltage overhead electrical

transmission lines in Loudoun County. The appellants, Loudoun County (the "County") and

Lansdowne Conservancy (the "Conservancy"), challenge the approval of the CPCNs for the

projects on multiple grounds. Although the appellants present several assignments of error, their

arguments primarily focus on the refusal of the Commission to require VEPCO to construct a

portion of the transmission lines underground. Upon review, we conclude that the Commission

did not err when it approved the CPCNs for the projects at issue. Accordingly, we affirm the judgments of the Commission.

## I. BACKGROUND

### A. THE ASPEN-GOLDEN AND APOLLO-TWIN CREEKS PROJECTS

In 2024, VEPCO submitted applications for CPCNs for two projects in Loudoun County—the "Aspen-Golden" Project and the "Apollo-Twin Creeks" Project. Both projects proposed the construction of new high-voltage electrical transmission lines, substations, and related facilities in or near "Data Center Alley," an area with an exceptionally high concentration of data centers.

The Aspen-Golden Project involved the construction of approximately nine miles of 500 kilovolt ("kV") and 230 kV transmission lines and associated substations. In part, the proposed Aspen-Golden transmission lines run beside Route 7 in the Lansdowne community of Loudoun County—a suburban community that includes residential developments, businesses, and data centers.

Although VEPCO identified four potential routes for the Aspen-Golden transmission lines, VEPCO preferred the route referred to as Route 1AA.[1] Tracking the pertinent language of Code § 56-46.1(B), VEPCO explained that Route 1AA "avoids or reasonably minimizes adverse impacts to the greatest extent reasonably practicable on the scenic assets, historic resources, and environment of the area concerned." VEPCO submitted a detailed analysis to support its position.

_____

[1] Route 1AA was slightly revised to accommodate landowners along the route after VEPCO filed its applications with the Commission. The hearing examiner and the Commission endorsed the modified version of Route 1AA that included the JKLH Belmont Landbay KK Variation and the Community Church Proposed Modified Segment.

VEPCO explained that the Aspen-Golden Project was designed to address challenges arising from the increased demand for electricity in eastern Loudoun County. Specifically, VEPCO asserted that the Aspen-Golden Project was required to relieve identified violations of mandatory reliability standards established by the North American Electric Reliability Corporation ("NERC").[2] VEPCO noted that the conditions giving rise to these violations could damage transmission lines and electrical facilities and cause power outages throughout the region. As the identified NERC violations were anticipated to occur in the summer of 2028, VEPCO intended to complete the Aspen-Golden Project by June 1, 2028.

The Apollo-Twin Creeks Project involved the construction of approximately 1.9 miles of 230 kV transmission lines and several substations. Almost half of the Apollo-Twin Creeks transmission lines would collocate with, or be placed alongside, the Aspen-Golden transmission lines. Unlike the Aspen-Golden transmission lines, however, the Apollo-Twin Creeks transmission lines did not run parallel to Route 7.

VEPCO explained that the Apollo-Twin Creeks Project would provide electrical service to three data center customers. Additionally, VEPCO asserted that the Apollo-Twin Creeks Project would help maintain reliable electrical service and address the overall load growth in the area. VEPCO intended to complete the Apollo-Twin Creeks Project by September 30, 2028.

VEPCO proposed to construct the Aspen-Golden and Apollo-Twin Creeks transmission lines in an overhead configuration. Steel framework, including monopoles as tall as 195 feet, would be used to support the transmission lines.

---

[2] NERC is a "non-profit corporation overseen by FERC [the Federal Energy Regulatory Commission] and its Canadian regulatory counterpart that is responsible for developing standards for transmission grid operation, monitoring and enforcing compliance with those standards, and assessing the reliability of interconnected regional grids." *Piedmont Env't Council v. Virginia Elec. & Power Co.*, 278 Va. 553, 559 (2009).

Anticipating the adverse visual impacts of the Aspen-Golden Project along Route 7, VEPCO hired a private engineering and consulting company to evaluate whether the Aspen-Golden transmission lines could be constructed underground. Due to the substantial engineering challenges posed by underground construction, however, VEPCO concluded that it could not feasibly construct the transmission lines underground by the target date of the Aspen-Golden Project.

B. THE PROCEEDINGS BEFORE THE COMMISSION

Upon VEPCO's motion, the Commission consolidated the applications pertaining to the Aspen-Golden and Apollo-Twin Creeks Projects for hearing purposes and appointed a senior hearing examiner to conduct further proceedings.

The County and the Conservancy, a property owners association encompassing numerous residential and commercial properties in the Lansdowne community, were among the parties who filed notices of participation in the consolidated proceedings.[3] The County and the Conservancy objected to the installation of overhead transmission lines along the Route 7 corridor. They argued that the overhead transmission lines would adversely impact scenic, historic, cultural, and environmental assets. Among other things, the County and the Conservancy asserted that overhead transmission lines would adversely impact views from several residential communities and the view of Belmont Manor, a historic home located near Route 7.

---

[3] Although additional parties filed notices of participation, they have not joined in the appeals. Theresa Ghiorzi has joined the appeals to a limited extent, supporting the Commission's decision as to the issues presented in the appellants' fifth assignments of error in Case Numbers 250494 and 250495 (i.e., the assignments of error based on the Commission's consideration of the County's comprehensive plan). Ghiorzi takes no position concerning the other issues presented on appeal.

Before VEPCO filed its applications with the Commission, the Conservancy hired RLC Engineering, PLLC ("RLC"), to develop a plan for the underground construction of a portion of the Aspen-Golden transmission lines. VEPCO, however, rejected RLC's initial proposal for several reasons.

After VEPCO rejected the initial proposal, the County hired RLC to prepare an updated proposal that addressed VEPCO's concerns. RLC subsequently developed a plan that became known as the Updated Hybrid Proposal ("UHP"). Under the UHP, three miles of the Aspen-Golden transmission lines running beside Route 7 would be constructed underground. RLC estimated that the UHP would cost approximately $1,112,000,000. This estimate exceeded the anticipated cost of the Aspen-Golden Project under VEPCO's proposal by $423,000,000. Nevertheless, the County and the Conservancy urged the hearing examiner to order VEPCO to construct a portion of the Aspen-Golden transmission lines underground as outlined in the UHP.

Acting pursuant to the pertinent provisions of Code § 56-46.1, the County requested that the Commission consider the costs and benefits associated with the underground construction of the Aspen-Golden transmission lines. Additionally, the County requested that the Commission consider the County's comprehensive plan. The County asserted that the Aspen-Golden Project did not comply with the comprehensive plan, which discouraged the construction of new overhead transmission lines running along major roadways whenever underground construction was possible.

The hearing examiner received testimony from members of the public regarding the pending applications during a telephonic hearing and an in-person hearing held in Loudoun County. Written comments from the public were also filed with the hearing examiner. The

5

members of the public who participated in the proceedings overwhelmingly supported the underground construction of at least a portion of the Aspen-Golden transmission lines.

The Commission's staff filed reports addressing the pending applications on August 21, 2024. The staff concluded that VEPCO had reasonably demonstrated the need for the Aspen-Golden Project. The staff agreed that the project would address projected violations of NERC reliability standards, ensure the structural integrity and reliability of the electrical transmission system, and accommodate overall load growth in the area.

When addressing the need for the Aspen-Golden Project, the staff expressly noted that it had "verified the power flow models provided by PJM[4] and confirmed the projected violations absent the proposed [p]roject." Additionally, the staff noted that it had "verified through power flow models that the proposed [p]roject resolves the projected reliability standards violations cited by [VEPCO]."

The staff did not oppose VEPCO's proposal for the Aspen-Golden Project, concluding that the overhead construction of the transmission lines along Route 1AA would minimize impacts on existing residences, scenic assets, historic resources, and the environment to the greatest extent reasonably practicable. Noting several specific concerns arising from the UHP, the staff questioned the feasibility of the underground construction of a portion of the Aspen-Golden transmission lines. Citing engineering challenges and routing uncertainties, the staff doubted whether VEPCO could construct a portion of the Aspen-Golden transmission lines underground pursuant to the UHP before the target date for the completion of the project.

---

[4] PJM Interconnection, LLC, or "PJM," is a "regional transmission entity . . . regulated by FERC and monitored by NERC that coordinates wholesale electricity transmission in 13 states and the District of Columbia, including most of Virginia." *Piedmont Env't Council*, 278 Va. at 559.

The staff also did not oppose VEPCO's proposal for the Apollo-Twin Creeks Project. The staff concluded that VEPCO had reasonably demonstrated the need for the project, which would provide electrical service to three data center customers and help maintain reliable electrical service in the region. The staff also determined that the proposed route for the project was optimal because it maximized collocation opportunities and avoided or minimized adverse impacts on existing residences, scenic assets, historic resources, and the environment to the greatest extent reasonably practicable.

The hearing examiner held a series of hearings from September 18-26, 2024, during which VEPCO, the County, the Conservancy, the Commission's staff, and other participating parties presented testimony, additional evidence, and legal arguments supporting their positions. These parties presented detailed testimony addressing numerous issues, including:

- The need for the Aspen-Golden and Apollo-Twin Creeks Projects;

- The feasibility of the underground construction of a portion of the Aspen-Golden transmission lines;

- The feasibility of the UHP developed by RLC on behalf of the County;

- The manner in which the Aspen-Golden Project would impact Belmont Manor and the Belmont Scenic Viewshed Easement;

- The requirements of the Loudoun County Comprehensive Plan;

- The anticipated adverse impacts of the Aspen-Golden and Apollo-Twin Creeks Projects—including impacts on property values, scenic assets, historic and cultural resources, and the environment; and

- VEPCO's efforts to minimize the anticipated adverse impacts of the Aspen-Golden and Apollo-Twin Creeks Projects.

C.  THE HEARING EXAMINER'S REPORT

The hearing examiner issued a 175-page report on November 1, 2024, recommending that the Commission approve VEPCO's applications and issue CPCNs for both the Aspen-Golden and Apollo-Twin Creeks Projects.

Addressing the need for the Aspen-Golden Project, the hearing examiner explained that the project was required to remedy identified violations of NERC reliability standards that were anticipated to occur in the summer of 2028.  More specifically, the hearing examiner noted that PJM's load flow modeling identified 21 monitored facilities that would exceed 100% of loading capacity without the Aspen-Golden Project.  The hearing examiner explained that these thermal overloads could damage VEPCO's electrical facilities and lead to service interruptions for the entire region.

The hearing examiner noted that Code § 56-46.1(B) requires the Commission to verify the load flow modeling, contingency analyses, and reliability needs presented to justify a new transmission line and its proposed method of installation.  The hearing examiner explained that the Commission's staff verified PJM's power flow models and confirmed that the identified violations would occur without the Aspen-Golden Project.  Additionally, the hearing examiner noted that the Commission's staff verified, through load flow modeling, that the Aspen-Golden Project would resolve the identified violations.

Although the hearing examiner acknowledged that certain benefits would arise from constructing a portion of the Aspen-Golden transmission lines underground, the hearing examiner noted that underground construction would cost substantially more than overhead construction.  More importantly, the hearing examiner questioned the feasibility of underground construction.

8

The hearing examiner observed that a project of this scope had never been constructed underground in the United States. Given the engineering challenges presented by such a project, the hearing examiner questioned whether the Aspen-Golden transmission lines could be constructed underground before the anticipated thermal overloads occurred in 2028. The hearing examiner concluded that underground construction would take longer to complete—in part due to the presence of diabase rock in the area and the presence of existing utility lines along the proposed route that would need to be relocated.

The hearing examiner explicitly rejected the UHP prepared by RLC on behalf of the County. Noting that the proposal lacked sufficient environmental impact and environmental justice analyses, the hearing examiner determined that the UHP did not meet the statutory criteria for the issuance of a CPCN. The hearing examiner also expressed concerns regarding the proposal's "route, constructability, and cost."

The hearing examiner explained that the exact route of the UHP was unclear, and that the UHP failed to address key issues such as the location of transition stations and the starting and ending points for the underground segment of the transmission lines. Furthermore, the hearing examiner noted that the route of the UHP appeared to cross under several planned homes, numerous streams, wetlands, a stormwater retention pond, and the property of a local historic church and cemetery.

Ultimately, the hearing examiner recommended that the Aspen-Golden transmission lines be constructed overhead along VEPCO's proposed Route 1AA. When evaluating the proposed route, the hearing examiner expressly considered the manner in which the Aspen-Golden Project would impact Belmont Manor. The hearing examiner recognized that the transmission lines would cross the Belmont Scenic Viewshed Easement and that at least two steel monopoles would

9

likely be constructed within the area protected by that easement. The hearing examiner, however, also noted that the language of the easement allowed public utilities to be constructed within the easement area.

Pursuant to the County's prior request, the hearing examiner considered the County's comprehensive plan. The hearing examiner acknowledged that the underground construction of the Aspen-Golden transmission lines would more closely align with the pertinent provisions of the comprehensive plan. Specifically, the hearing examiner recognized that underground construction would avoid the installation of new overhead transmission lines along a section of Route 7 that the County identified as a "gateway corridor." Nonetheless, the hearing examiner noted that the construction of overhead transmission lines along Route 7 did not violate the "letter" of the comprehensive plan.

After weighing the adverse impacts of the Aspen-Golden Project, the hearing examiner adopted VEPCO's proposed route for the Aspen-Golden transmission lines. Based on the totality of the record, the hearing examiner concluded that the overhead construction of the transmission lines along Route 1AA would avoid or reasonably minimize adverse impacts to scenic, historic, cultural, and environmental resources to the greatest extent reasonably practicable. The hearing examiner recommended that the Commission grant VEPCO's application and issue a CPCN for the Aspen-Golden Project.

The hearing examiner reached a similar conclusion regarding the Apollo-Twin Creeks Project, noting that the project was largely uncontested.[5] The hearing examiner recommended

---

[5] In contrast to the Aspen-Golden Project, there was no controversy regarding the underground construction of the Apollo-Twin Creeks transmission lines. The hearing examiner explained that the underground construction of the Apollo-Twin Creeks transmission lines was not pursued for several reasons, including adverse impacts to wetlands and insufficient rights of way.

that the Commission grant VEPCO's application and issue a CPCN for the Apollo-Twin Creeks Project.

## D. THE COMMISSION'S FINAL ORDERS

The participating parties and the Commission's staff filed comments addressing the hearing examiner's report. VEPCO and the Commission's staff agreed with the hearing examiner's findings and recommendations.[6] The County and the Conservancy challenged the hearing examiner's report on numerous grounds. Their primary arguments, however, addressed the underground construction of the Aspen-Golden transmission lines.

The County and the Conservancy requested that the Commission reject the hearing examiner's findings and recommendations and order VEPCO to construct a portion of the Aspen-Golden transmission lines underground. Alternatively, the Conservancy requested that the Commission impose additional conditions to mitigate the visual impacts of the overhead Aspen-Golden transmission lines.[7]

The Commission granted VEPCO's applications and issued CPCNs for the Aspen-Golden and Apollo-Twin Creeks Projects, adopting the hearing examiner's findings and recommendations. In its order addressing the Aspen-Golden Project, the Commission expressly endorsed the hearing examiner's extensive analysis of the feasibility of underground construction

---

[6] Ghiorzi also filed comments supporting the hearing examiner's report, asserting that the recommended overhead route imposed the least impact on private property.

[7] Specifically, the Conservancy requested that the Commission order VEPCO to: (1) refrain from collocating other utility lines within the right of way approved for the Aspen-Golden Project, (2) install and maintain vegetation to reduce the visual impact of the Aspen-Golden transmission lines and other associated structures, and (3) only utilize the amount of approved right of way that was necessary for the implementation of the Aspen-Golden Project. The Conservancy also requested that the Commission keep the record open in the Aspen-Golden case to facilitate the enforcement of these conditions. The County did not join the Conservancy's request.

and the UHP.  The Commission did not impose the additional conditions requested by the Conservancy.  These appeals followed.

## II.  ANALYSIS

The appellants challenge the Commission's judgments on several grounds.  First, the appellants contend that the Commission failed to verify certain information establishing the need for the Aspen-Golden Project.  Next, the appellants argue that the Commission erred by determining that the underground construction of a portion of the Aspen-Golden transmission lines was not feasible.  The appellants maintain that the Commission erroneously rejected the UHP, in part because the Commission impermissibly required the appellants to present a fully developed proposal sufficient to justify the issuance of a CPCN.

The appellants claim that the Commission erred by permitting the overhead construction of the Aspen-Golden transmission lines along VEPCO's proposed Route 1AA, asserting that the construction of overhead transmission lines along the proposed route would interfere with the Belmont Scenic Viewshed Easement and violate the County's comprehensive plan.  Moreover, the appellants contend that the overhead construction of the transmission lines would not minimize adverse impacts to scenic, cultural, historic, and environmental assets along Route 1AA.  The Conservancy also claims that the Commission erred by failing to impose additional conditions to reduce the visual impacts of the overhead transmission lines.

Finally, the appellants challenge the Commission's approval of the Apollo-Twin Creeks Project.  Noting the proposed collocation of the Apollo-Twin Creeks and Aspen-Golden transmission lines, the appellants argue that the CPCN for the Apollo-Twin Creeks Project should have included provisions to accommodate the underground construction of the Aspen-Golden transmission lines.

12

A. THE STANDARD OF REVIEW

"The Constitution of Virginia and statutes enacted by the General Assembly give the Commission 'broad, general and extensive powers' in regulating public utilities." *BASF Corp. v. State Corp. Comm'n*, 289 Va. 375, 391 (2015) (quoting *Office of the Att'y Gen. v. State Corp. Comm'n*, 288 Va. 183, 190 (2014)). The Commission's decisions are "entitled to the respect due judgments of a tribunal informed by experience," *id.* (quoting *Appalachian Voices v. State Corp. Comm'n*, 277 Va. 509, 516 (2009)), and they come to the Court with a "presumption of correctness," *West Virginia v. State Corp. Comm'n*, 304 Va. 148, 160 (2025).

We are "neither at liberty to substitute [our] judgment in matters within the province of the Commission nor to overrule the Commission's finding[s] of fact unless we can say its determination is contrary to the evidence or without evidence to support it." *Appalachian Power Co. v. State Corp. Comm'n*, 301 Va. 257, 292 (2022) (quoting *Board of Supervisors v. Appalachian Power Co.*, 216 Va. 93, 105 (1975)). While we review the Commission's conclusions of law de novo, "we will not disturb the Commission's analysis when it is 'based upon the application of correct principles of law.'" *BASF Corp.*, 289 Va. at 391 (quoting *Appalachian Voices*, 277 Va. at 516).

B. THE VERIFICATION OF THE LOAD FLOW MODELING, CONTINGENCY ANALYSES, AND RELIABILITY NEEDS SUPPORTING THE ASPEN-GOLDEN PROJECT

Before issuing a CPCN for the construction of a new electrical transmission line of 138 kV or more, the Commission must initially determine whether the new transmission line is needed. *See* Code § 56-46.1(B). "In making the determinations about need, corridor or route, and method of installation, the Commission shall verify the applicant's load flow modeling,

13

contingency analyses, and reliability needs presented to justify the new line and its proposed method of installation." *Id.*

The appellants contend that the Commission failed to verify the load flow modeling, contingency analyses, and reliability needs presented to justify the overhead construction of the Aspen-Golden transmission lines. This argument, however, is not supported by the record.

In their report to the Commission, the Commission's staff expressly confirmed that they verified the data establishing the need for the Aspen-Golden Project. The report explained that the Commission's staff verified the power flow models provided by PJM and confirmed that the identified violations of NERC reliability standards would occur without the Aspen-Golden Project. Furthermore, the report explained that the Commission's staff verified that the Aspen-Golden Project would resolve the identified violations. Neither the County nor the Conservancy challenged the verification of this data when they cross-examined the witness sponsoring the section of the staff report addressing this issue.

As to the method of installation, the Commission's staff concluded that the Aspen-Golden transmission lines should be constructed overhead along Route 1AA. Although the Commission's staff investigated the underground construction of the Aspen-Golden lines, they rejected underground construction for numerous reasons, including "timing, cost, and constructability." Given the substantial engineering challenges presented by underground construction, the Commission's staff concluded that underground transmission lines were unlikely to be constructed before the identified violations of NERC reliability standards and the resulting thermal overloads occurred in the summer of 2028. Under these circumstances, the Commission's staff determined that overhead construction was the only feasible option for the project.

In some cases, the Commission's staff has engaged an independent consultant to verify technical information provided by a CPCN applicant. *See Piedmont Env't Council v. Virginia Elec. & Power Co.*, 278 Va. 553, 570 (2009). Code § 56-46.1(B), however, does not require them to do so. In the present case, the record is sufficient to establish that the Commission verified the load flow modeling, contingency analyses, and reliability needs supporting the Aspen-Golden Project. Accordingly, the appellants' first argument is without merit.

C. THE REJECTION OF THE UNDERGROUND CONSTRUCTION OF THE ASPEN-GOLDEN TRANSMISSION LINES

When evaluating an application for a CPCN for a project involving the construction of an electrical transmission line of 138 kV or more, the Commission "shall consider, upon the request of the governing body of any county . . . in which the line is proposed to be constructed, (a) the costs and economic benefits likely to result from requiring the underground placement of the line and (b) any potential impediments to timely construction of the line." Code § 56-46.1(B). The Commission fully considered the underground construction of the Aspen-Golden transmission lines in this case, expressly adopting the hearing examiner's detailed analysis concerning this issue.

Numerous witnesses testified about the feasibility of the underground construction of the Aspen-Golden transmission lines and the UHP. Based on this testimony, the hearing examiner concluded that underground construction was not feasible for several reasons—including increased costs, engineering challenges, and the time constraints of the Aspen-Golden Project. This conclusion is supported by the record.

The record establishes that underground construction would cost substantially more than overhead construction. Brian Conroy, an engineer employed by RLC, confirmed that the UHP would cost approximately $423,000,000 more than VEPCO's proposal for the overhead

15

construction of the Aspen-Golden transmission lines. Other witnesses explained that the cost of underground construction could greatly exceed Conroy's estimate.

More significantly, the record also establishes that underground construction would present numerous engineering challenges. Noting that 500 kV transmission lines are rarely constructed underground, VEPCO's engineers testified that the underground construction of the Aspen-Golden transmission lines would require specialized materials, work crews, and equipment that may not be readily available. Additionally, VEPCO's engineers explained that the Aspen-Golden transmission lines would be constructed in an area with shallow diabase rock, which would slow the pace of underground construction. VEPCO's engineers also explained that existing underground utility lines in the area would need to be relocated before underground transmission lines could be constructed along the proposed route.

Like the Commission's staff, the hearing examiner determined that the engineering challenges of underground construction would delay the completion of the Aspen-Golden Project. The hearing examiner emphasized that the Aspen-Golden Project needed to be completed by the summer of 2028 to resolve identified violations of NERC reliability standards and resulting thermal overloads that could damage VEPCO's electrical facilities and lead to service interruptions in the region. Given the time constraints of the Aspen-Golden Project, the hearing examiner reasonably rejected the underground construction of a portion of the Aspen-Golden transmission lines.

The hearing examiner expressly noted that the UHP did not meet the statutory criteria for the issuance of a CPCN. Among other things, the hearing examiner explained that the UHP did not provide sufficient environmental impact and environmental justice analyses and that the route of the proposed underground transmission lines was uncertain.

These observations were relevant to the hearing examiner's analysis of the feasibility of the underground construction of the Aspen-Golden transmission lines. The hearing examiner recognized that the analytical deficiencies of the UHP would take additional time to resolve, further delaying the completion of the Aspen-Golden Project. The analytical deficiencies of the UHP presented impediments to the timely construction of the Aspen-Golden transmission lines, and therefore, constituted a pertinent factor for the hearing examiner to consider under the express language of Code § 56-46.1(B).

In the present case, the record establishes that the Commission fully considered the underground construction of a portion of the Aspen-Golden transmission lines and reasonably rejected that course of action. We will not disturb the Commission's judgment regarding this issue on appeal.

D. THE CONSIDERATION OF THE BELMONT SCENIC VIEWSHED EASEMENT

The Belmont Scenic Viewshed Easement is held by the County. The purpose of the easement is "to preserve and to maintain an unobstructed view of the historic Belmont Manor House from Route 7." In their pertinent assignment of error, the appellants assert that VEPCO's proposed overhead construction of the Aspen-Golden transmission lines along Route 1AA "violates the Belmont Scenic Viewshed Easement at least twice, and thus does not minimize, to the extent reasonably practicable, the adverse impacts to scenic, cultural, and historic assets along the route, as required by Code § 56-46.1(B)."[8]

---

[8] On brief, the appellants also argue that the alleged violations of the easement precluded the proposed overhead construction of the transmission lines "as a matter of law." This argument falls outside of the scope of the appellants' assignment of error, and it was not presented during the proceedings before the Commission. Consequently, we will not consider this particular argument on appeal. *See* Rule 5:21(a)(7) (addressing procedural default in appeals arising from a judgment of the Commission).

The record establishes that the Commission considered the manner in which the Aspen-Golden Project would impact Belmont Manor. The hearing examiner observed that VEPCO's proposal would require at least two steel monopoles to be constructed in the area subject to the Belmont Scenic Viewshed Easement. The hearing examiner also noted that the language of the easement permitted public utility structures to be constructed within the protected viewshed.

After weighing the adverse impacts on Belmont Manor and the alleged violations of the viewshed easement with other factors, the hearing examiner and the Commission concluded that Route 1AA presented the optimal route for the overhead transmission lines. The hearing examiner and the Commission determined that the construction of the transmission lines along Route 1AA minimized overall adverse impacts to scenic, cultural, historic, and environmental assets—notwithstanding the adverse impacts to Belmont Manor and the alleged violations of the viewshed easement. We conclude that this determination is supported by the record.

E. THE CONSIDERATION OF THE LOUDOUN COUNTY COMPREHENSIVE PLAN

Whenever the Commission is required to approve the construction of any electrical utility facility, the locality in which the facility is proposed to be constructed may request that the Commission "receive and give consideration . . . to local comprehensive plans that have been adopted pursuant to Article 3 ([Code] § 15.2-2223 *et seq.*) of Chapter 22 of Title 15.2." Code § 56-46.1(A). The record in this case clearly establishes that the Commission considered the Loudoun County Comprehensive Plan.

William Giglio testified on behalf of the County about the comprehensive plan. Giglio explained that the comprehensive plan urged electrical service providers to minimize impacts on roadways, heritage resources, and existing residential communities by considering the construction of underground transmission lines where possible. Giglio also asserted that the

18

construction of underground transmission lines was of particular importance along "gateway corridors," such as Route 7.

The hearing examiner expressly addressed the comprehensive plan in her report to the Commission. Although the hearing examiner recognized that the underground construction of the Aspen-Golden transmission lines would more closely align with the County's comprehensive plan, the hearing examiner explained that underground construction was not feasible. The Commission fully adopted the hearing examiner's conclusions, thereby satisfying the statutory requirement to "receive and give consideration to" the comprehensive plan.

Citing the provisions of Code § 15.2-2232,[9] the appellants contend that the Commission was required to determine whether the proposed Aspen-Golden transmission lines were in "substantial accord" with the County's comprehensive plan. This argument lacks merit.

Code § 56-46.1(A) only requires the Commission to "give consideration to" a locality's comprehensive plan. We have recently explained that when the General Assembly directs the Commission to "consider" a certain factor, the Commission is not required to make specific findings related to that factor. *West Virginia*, 304 Va. at 158. Instead, the Commission is simply required "to reflect" on the factor or "think about [it] with a degree of care or caution." *Id.* (quoting Webster's Third New International Dictionary 483 (1993)).

Other provisions of Code § 56-46.1 establish that the Commission was not required to engage in a "substantial accord" analysis under Code § 15.2-2232. When the Commission approves the construction of an electrical transmission line under Code § 56-46.1, the approved

---

[9] In pertinent part, Code § 15.2-2232 provides that if a locality has adopted a comprehensive plan, no new structures shall be constructed unless and until they have been approved by the local planning commission as being "substantially in accord with the adopted comprehensive plan." Code § 15.2-2232(A).

transmission line is deemed to comply with local comprehensive plans and zoning ordinances. Code § 56-46.1(F) states: "Approval of a transmission line pursuant to this section shall be deemed to satisfy the requirements of [Code] § 15.2-2232 and local zoning ordinances with respect to such transmission line." This subsection of the statute eliminates the need for any separate "substantial accord" analysis under Code § 15.2-2232 addressing the proposed Aspen-Golden transmission lines.

F.  THE CONSIDERATION OF THE ADVERSE IMPACTS OF THE ASPEN-GOLDEN PROJECT

When considering an application for a CPCN for a project involving the construction of an electrical transmission line of 138 kV or more, the Commission "shall determine that the line is needed and that the corridor or route chosen for the line will avoid or reasonably minimize adverse impact to the greatest extent reasonably practicable on the scenic assets, historic and cultural resources . . . , and environment of the area concerned." Code § 56-46.1(B).

This determination involves the consideration of a "multitude of factors." *BASF Corp.*, 289 Va. at 400. "When presented with an application for transmission line construction, the Commission must 'balance' adverse impacts along with other 'factors' and 'traditional considerations.'" *Id.* at 394-95 (quoting *Board of Supervisors*, 216 Va. at 100). The term "minimize" does not require the elimination of all impact. *Id.* at 399. After weighing the pertinent factors, the Commission "must decide within the parameters of the statute what best serves the 'total public interest.'" *Id.* at 395 (quoting *Board of Supervisors*, 216 Va. at 104).

After considering numerous factors, the hearing examiner and the Commission approved the construction of overhead transmission lines along Route 1AA, concluding that this course of action would minimize adverse impacts to scenic assets, historic and cultural resources, and the environment to the greatest extent reasonably practicable. The record supports this conclusion.

20

VEPCO's witnesses testified that Route 1AA was designed to collocate with existing roadways and pass through commercial and industrial areas, avoiding residential areas and historic resources to the greatest extent possible. The record confirms that Route 1AA avoids several residential communities, wetlands, and other areas of environmental significance, including creeks, ponds, and forested areas. The record also establishes that the route avoids crossing the Lansdowne Viewshed Easement, which protects views from nearby residential communities. Additionally, the record establishes that the route minimizes the impact of the overhead transmission lines on the operation of a helipad at a nearby hospital.

While underground construction of the transmission lines may have avoided some of the adverse visual impacts of the Aspen-Golden Project, the hearing examiner and the Commission determined that underground construction was not feasible for several reasons—including costs, engineering challenges, and time constraints. Therefore, the hearing examiner and the Commission concluded that underground construction did not present a viable option for minimizing the adverse impacts of the Aspen-Golden Project.

In the present case, the Commission fulfilled its statutory duty to consider the adverse impacts of the Aspen-Golden Project and the efforts taken to minimize those impacts. After doing so, the Commission reasonably determined that the adverse impacts arising from the project were minimized to the greatest extent reasonably practicable. We will not disturb the Commission's decision on appeal.

G. THE REFUSAL TO IMPOSE ADDITIONAL CONDITIONS ON THE ASPEN-GOLDEN PROJECT

The Conservancy argues that the Commission erred when it refused to impose additional conditions addressing the adverse visual impacts of the Aspen-Golden Project. Significantly, the Conservancy did not address these conditions during the proceedings before the hearing

21

examiner. The Conservancy first requested the imposition of the conditions in its comments addressing the hearing examiner's report. Neither the Conservancy nor the County presented any evidence regarding the requested conditions or provided specific information to explain how the conditions would minimize the visual impacts of the overhead transmission lines.

Under these circumstances, the Commission did not abuse its discretion when it declined to impose the conditions at issue. *See West Virginia*, 304 Va. at 162-63 (applying an abuse of discretion standard when reviewing the Commission's refusal to impose additional conditions in a CPCN).

## H. THE APPROVAL OF THE APOLLO-TWIN CREEKS PROJECT

The appellants also contend that the Commission erred by approving the Apollo-Twin Creeks Project. Noting that the Apollo-Twin Creeks transmission lines were planned to collocate with the Aspen-Golden transmission lines for approximately one mile, the appellants argue that the Commission should have included provisions in the CPCN for the Apollo-Twin Creeks Project to accommodate the underground construction of the Aspen-Golden transmission lines.

The appellants' challenge to the approval of the Apollo-Twin Creeks Project is entirely contingent on the success of their arguments challenging the overhead construction of the Aspen-Golden transmission lines. We have determined that the Commission did not err by approving the construction of overhead transmission lines in the Aspen-Golden Project. Consequently, the appellants' argument has lost its foundation.

As the Aspen-Golden transmission lines will be constructed overhead instead of underground, the Commission did not need to include provisions in the CPCN for the Apollo-Twin Creeks Project to accommodate the underground construction of the Aspen-Golden

transmission lines. We conclude that the Commission did not err by issuing the CPCN for the Apollo-Twin Creeks Project.

## III. CONCLUSION

For the reasons stated, we affirm the judgments of the Commission.

*Affirmed.*